## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TIM AND MARI POTTER, TMP VENTURES, LLC, SCOTT RUSH, AND S & D RUSH CORP., | Civil Action No. _____ |
| Plaintiffs, | |
| v. | Judge _____ |
| THE FILE DEPOT, LLC, A.G. CROWE, ROB PERRY, AND ST. GREGORY DEVELOPMENT GROUP, LLC, | |
| Defendants. | Magistrate Judge _____ |

## COMPLAINT

Plaintiffs Tim and Mari Potter and TMP Ventures, LLC (together, the "Potters"), and Scott Rush and S & D Rush Corp. (together, "Rush") (collectively "Plaintiffs"), by their attorneys, for their complaint against Defendants The File Depot, LLC ("File Depot" or "Franchisor"), A.G. Crowe ("Crowe"), Rob Perry ("Perry"), and St. Gregory Development Group, LLC ("SGG") (collectively, "Defendants"), allege and aver as follows:

### Background

1.     File Depot is a franchisor selling the rights to franchisees to own businesses that purport to provide a full range of document management products and services to other business clients, including document organization,

storage, digitization, and shredding.  File Depot claims to "have put together an extraordinary 'turn-key' business opportunity that provides an important cost-effective service to virtually every type and size business."

2.      This is an action by former File Depot franchisees and their owners against File Depot; its former President and Chief Executive Officer and current owner, A.G. Crowe; its current President and Chief Executive Officer, Rob Perry; and SGG, the franchise broker that File Depot used in pitching and selling its franchises to prospective franchisees, including Plaintiffs.  Plaintiffs assert claims for fraud, fraud by omission, violation of state franchise laws, and breach of contract.  In brief, Defendants induced Plaintiffs to purchase franchises and open File Depot businesses upon unfounded and unlawful representations: that File Depot had a unique, distinctive, and proven system; that it had systems in place for and the ability to support new franchisees; and that a warehouse in Louisiana that the Plaintiffs were shown at discovery day and training was an example of a franchisee operating under the Franchisor's proven system.  In reliance upon these, and other, representations, Plaintiffs leased and outfitted spaces for File Depot businesses, and invested in excess of $500,000.

3.      In fact, the information furnished to Plaintiffs was false and known to be false by Defendants.  Specifically, File Depot had no unique, proprietary, or proven system; it did not have the staff, infrastructure, or systems in place to support new franchisees; and the Louisiana warehouse was not operating under File Depot's "proven system" and, in fact, could not have been, since no such

system existed.  As a result, Plaintiffs lost or became indebted for an amount in excess of $500,000, which they seek to recover in this case, along with costs and attorneys' fees, for Defendants' unlawful conduct.

**Parties**

**Plaintiffs**

4.      The Potters, who are the only members of TMP Ventures, LLC, are citizens and residents of the state of New York.

5.      Scott Rush is a citizen and resident of the state of Indiana.

6.      S & D Rush Corp. is an Indiana corporation with its principal place of business in Logansport, IN.

**Defendants**

7.      The File Depot, LLC is a Louisiana limited liability company with its principal place of business in Slidell, LA.  File Depot is engaged in the business of franchising file storage and shredding businesses under the trademark "The File Depot".

8.      A.G. Crowe is, upon information and belief, a citizen and resident of the state of Louisiana.  He was the President and Chief Executive Officer of File Depot at the time that Plaintiffs purchased their respective franchises.

9.      Rob Perry is, upon information and belief, a citizen and resident of the state of Louisiana.  He is the current President and Chief Executive Officer of File Depot.

10.     St. Gregory Development Group, LLC is, upon information and belief, an Ohio limited liability company with its principal place of business in Cincinnati, OH.   SGG is in the business of franchise sales and brand development on behalf of franchisors.

### Jurisdiction and Venue

11.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy for each of Rush and the Potters exceeds $75,000 exclusive of interest and costs.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial number of the acts and transactions giving rise to the claims herein occurred within this district.

### Facts

### The Business

13.     Many businesses, governments and organizations are increasingly seeking not to house their own paper records on site, and as such these types of entities have a need to manage, protect, and properly destroy their vital records. As a result, many companies have emerged to provide secure document storage, management, digitization, and shredding for these entities, such that there is significant competition in this field.

14.     File Depot held itself out to franchisees as having a competitive edge against other similar companies, and claimed that franchisees could

become profitable quickly by targeting low hanging fruit. It advertises to clients that its franchisees offer HIPAA compliant records storage, delivery, disposal and document management services that are confidential, efficient and secure.

**The Potters**

15.    The Potters first became interested in becoming a File Depot franchisee in early July 2015, while working with a "franchise portfolio adviser" at FranChoice, a consulting firm that brokers the sale of franchises to franchisees.

16.    This adviser introduced the Potters to the File Depot franchise opportunity, after which they participated in a call on July 22, 2015 with Glenn Gordon, Senior Brand Manager at SGG ("Gordon").

17.    During this call, Gordon told the Potters about the File Depot opportunity in more detail, and followed up with an email to the Potters that included information regarding File Depot's system.  The materials that Gordon reviewed with, and later sent to, the Potters included a PowerPoint presentation titled "The File Depot Intro" as well as a "Marketing & Operations" presentation.

18.    "The File Depot Intro" presentation stated, in part, that: growth was "inevitable" for franchisees; a franchised location had not made a sales call in over three years (as evidence of a high retention rate); a franchisee would merely need to follow up on Internet-generated leads from File Depot's website; the system had low overhead and quick ramp up; and that the franchise was easy to manage and could be successfully run by an absentee owner.

19.    Other representations made on this call included:

- File Depot franchisees have a 45.6% profit margin;

- The total investment in the franchise would be $115,000 to $145,000, reflecting a smaller financial commitment than many other franchise opportunities, and a profitable business with high profit margin;

- File Depot franchises enjoyed a 98% customer retention rate; and

- It took File Depot franchises 90 days to 6 months to break even.

20.    Additionally, the "Marketing & Operations" presentation boasted limited competition, a short sales cycle, Franchisor launch support, virtual training, and email templates and sending capabilities.  The presentation touted File Depot as an established, successful brand that would allow franchisees to "create a value-driven monopoly" and stated that franchisees were able to fly under their national competitors' radars by targeting "low hanging fruit."  These representations, however, proved to be untrue. In addition, the presentation included the following misrepresentations:

- It promised an "Online Portal Loaded with Curriculum" that did not exist, with the result that there was no "Ramp-Up Process," or "Access within 48 Hours;"

- There was no "Lifetime Support," "Annual Conventions," or "Sharing Ideas for Getting More Customers," as promised in the presentation;

- There was no "Success Assurance Plan," nor were there email templates, proposal capabilities or e-marketing templates as this presentation represented.

21.    Between mid-July and mid-August 2015, the Potters participated in several calls with File Depot and were invited by Gordon to attend Discovery Day, a franchisor-hosted event to introduce prospective franchisees to the franchise.  File Depot even offered to pay $500 each for the Potters' flights and lodging in New Orleans for Discovery Day.

22.    The Potters attended Discovery Day on August 20 - 21, 2015. During Discovery Day, the Potters met with File Depot's Corporate Executive Team, which included Crowe and Perry, who went over the details of File Depot's business model and system.  This meeting also included Gordon and Travis Miller from SGG ("Miller") as well as other prospective franchisees, including Tyler Garrett and his business partner and Shana Erenberg and her husband.

23.    Also during Discovery Day, on August 20, 2015, Emily Brown from SGG ("Brown") sent to the Potters via email the Franchise Disclosure Document ("FDD") for The File Depot, which is a prospectus similar to that required for a securities offering, including details about File Depot and the File Depot franchise opportunity.

24.    On the second day of Discovery Day, August 21, 2015, the prospective franchisees in attendance went with Crowe and Perry to a warehouse in Slidell, Louisiana that was held out as a File Depot business, and were shown what was described as a "fully operational business," with shelving units that were entirely full of boxes, a shredding machine in action the entire

time of the attendees' visit, and a tour from the warehouse owner.  At no point during this tour, however, was it disclosed to the Discovery Day attendees that this owner was not using File Depot's system that was being offered to new franchisees, as this owner had been a former licensee operating for many years under a different model.

25.    The Potters, impressed by what they were shown at the operating facility during the Discovery Day visit, were interested in moving forward with their investigation of the File Depot franchise opportunity.

26.    Perry also represented to the Potters on multiple occasions during this time period that a File Depot franchise should break even at around 35 customers, averaging 400 boxes each, and that this could be achieved within 4-6 months of operation.

27.    After Discovery Day, on August 23, 2015, Mari Potter emailed Perry asking for a follow up call to discuss details of the franchise opportunity. Specifically, Mari Potter mentioned that she would like to discuss mapping for four franchise territories, three in the state of New York and one in the state of Georgia, including competition in those areas; details of the financial information that had been provided to the Potters by File Depot; questions related to advertising and operations of the business; and other concerns and questions.

28.    During a phone call among the Potters, Gordon, and Perry on August 25, 2015, Mari Potter asked whether File Depot had adequate infrastructure in place to appropriately support franchisees as they expanded

their system, and questioned what exactly the Potters would be getting for the $49,500 franchise fee that was being requested of them.  In response, Gordon and Perry stated that there was no reason for concern as to File Depot's readiness to support its franchisees through system expansion but nonetheless agreed to decrease the royalty fees for the Potters if they decided to move forward with purchasing a franchise territory.  Shortly after this phone call, the Potters began to discuss potential territories with Perry.

29.    On August 27, 2015, Perry sent a spreadsheet to the Potters that included financial projections, including monthly and annual revenue projections and gross profit projections, as well as a breakeven number of boxes.

30.    On that same day, Mari Potter emailed with Mike Purcell, another prospective File Depot franchisee ("Purcell"), regarding the financial projections that File Depot had provided to both franchisees.  Purcell noted in his email "they continue to say the breakeven comes around 30 customers, with an average of 400 boxes at $0.60 per box ($0.40 for storage and $0.20 for services)."  These numbers reflect the representations that had been made to the Potters regarding the breakeven points that could be expected for a File Depot franchisee.

31.    Relying on File Depot's representations, financial projections, and the information presented at Discovery Day, on August 27, 2015, Mari Potter informed Perry that she and her husband were ready to move forward with the process of becoming a franchisee of File Depot.

9

32.     Shortly thereafter, on September 1, 2015, Brown sent application forms and background check forms to the Potters, as well as another copy of the FDD, a Franchise Agreement, and a pre-closing checklist.

33.     The Potters signed a Franchise Agreement for File Depot on November 3, 2015 (the "Potter Franchise Agreement").

34.     The Potter Franchise Agreement included, among others, the following provisions:

☐     "TFD and its affiliate/principals, as a result of the expenditure of time, skill, effort, and money, have developed and own a unique system (the "System") related to the establishment, development, opening, and operation of a business . . .."

☐     "TFD's System is comprised of various proprietary and, in some cases, distinguishing elements . . .."

☐     TFD's manuals "contain significant proprietary and confidential information which makes the System unique as a whole . . .."

☐     "At all times during the term of this Agreement, Franchisee must (a) diligently and effectively promote, market and engage in the Franchised Business, (b) develop, to the best of its ability, the potential for the Franchised Business, and (c) devote and focus its attentions and best efforts to such promotion and development."

☐     "Prior to opening, TFD will provide, as TFD deems appropriate in its sole discretion, to Franchisee the following assistance . . . (8) provide Franchisee with the Initial Supplies Kit (as defined in Section 3.02(c)), as well as provide the products/services associated with the Initial Launch Marketing Kit . . .."

☐    "Upon reasonable notice, TFD may require attendance
of designated personnel of Franchisee (and Franchisee
and such designated personnel shall attend) at
additional training courses, seminars, conferences,
webinars, or other programs that are deemed by TFD to
be relevant or appropriate to the successful operation of
the System."

☐    "TFD will be reasonably available to the Primary
Contact Owner or General Manager during normal
business hours at its headquarters for consultation and
guidance with respect to the operation and
management of the Franchised Business."

☐    "Franchisee will, during the term of this Agreement,
operate the Franchised Business, in accordance with
this Agreement and the System as set forth in the
Manuals, on a full-time and continuous basis, except as
caused by events of Force Majeure."

☐    "Franchisee must use the computerized record keeping
and accounting systems that TFD may establish or
designate."

☐    "Franchisee must use an e-mail address TFD
designates or approves for communication with TFD."

☐    "Franchisee must use in the Franchised Business at all
times the proprietary CRM [i.e., the customer
relationship management system ("CRM")] which TFD
(or TFD's designated supplier) has developed and/or
selected for the System."

35.    During the fall of 2015, the Potters were also working with FranFund,

a company that provides support and guidance to franchisees and other small

businesses in finding funding for starting up their businesses, to fund the

purchase of their franchise.  On November 10, 2015, Mari Potter emailed Perry

with questions that FranFund had asked her about the projections she had

provided based on File Depot's projections, including questions about a breakdown of sales, whether there would be revenue achieved in months one and two of operation, the cost of goods sold, credit card fees, and miscellaneous expenses.  In response to these questions, Perry responded, in part "shredding accounts are attainable quickly as people have stuff to shred as you begin to talk to them.  You should also be able to get a couple of accounts or more the second month at least."

36.    From November 16, 2015 to November 20, 2015, Mari Potter and Brian Gay ("Gay"), the manager that the Potters had hired for their new File Depot business, attended training in New Orleans with File Depot executives, including Crowe, Perry, Gary Hardin, Sr. ("Hardin") and James Madison, who was hired the following week as VP of Operations ("Madison").

37.    During training, the Potters learned that:

☐    Both the Sales Director and the head of the IT department for File Depot were not full time salaried employees of File Depot, and in fact, Franchisor had very few full time, salaried employees to support its franchisees;

☐    File Depot was "in the process of finishing up all of the updates" to the CRM software for the system, so franchisees could not receive full instructions on how to use it and some important features were still missing;

☐    The employee of File Depot responsible for coaching new franchisees on sales, Hardin, instructed franchisees on the basis of very outdated sales methods—cold calling, door-to-door sales, and mass postcard mailings—with no instruction at all to

franchisees on how to sell online, use pay-per-click advertising, or improve search engine optimization; and

☐　The new franchisees were taken on another tour of the same warehouse as they had been brought to during Discovery Day, and were not given the opportunity to see any other operating warehouses, including those owned by File Depot's executives.

38.　During training, Hardin told Mari Potter and Gay again that they could expect to obtain two new customers per month per salesperson and Perry represented to Mari Potter that the average customer had 400 boxes.

39.　The Potters opened for business in December of 2015.

40.　After purchasing the franchise, the Potters encountered a number of issues with the franchise system that were inconsistent with the representations that Franchisor had made to them prior to purchase.  These included:

☐　Many of the weekly sales and operations meetings that File Depot undertook to schedule for the purpose of training franchisees in marketing and otherwise growing their businesses were cancelled, including on November 24, 2015, December 1, 2015, and February 9, 2016.

☐　On December 10, 2015, Mari Potter emailed Bruce Boner ("Boner") and Perry regarding issues with Franchisor's call center.  The Potters had been informed by an employee of Franchisor that some of the establishments to which the call center had made calls in the Potters' territory had hung up on the call center. However, when the Potters contacted these establishments, representative of these establishments informed the Potters that they did not hang up on any calls that were not computerized messages.  Although the call center was supposed to be staffed with live employees, the issue with this call center hurt the

Potters' image as they were introducing their new business in their territory.

☐ On January 15, 2016, Mari Potter emailed Perry and Boner regarding issues with bar coding and using the CRM system with an iPad at their business. Despite multiple emails to various employees at File Depot, the Potters did not even get a response offering any type of assistance until five days after their initial email. The assistance requested by the Potters was crucial to their business operations, and this delay by File Depot harmed the Potters' business.

☐ On January 20, 2016, Mari Potter emailed Perry regarding issues with her franchisee-website, after failing to receive the appropriate assistance from Franchisor upon her first request. In response, Franchisor was not able to provide a solution immediately to the website issue, and so Mari Potter was forced to offer her own technical background to help fix the website.

☐ Franchisor's email system was broken, such that when the Potters sent emails to prospective clients, many did not reach their intended recipients. Mari Potter checked the system using a test provided by Franchisor, which indicated that the email system was performing at a 3.1 out of 10, indicating that approximately 7 out of every 10 emails sent by the Potters would not reach their intended recipients. When Mari Potter brought this up to Franchisor, she was told to call all prospective clients to verify that her emails had been received, but no permanent solution was provided.

☐ After months of operation, the Potters discovered that they were not able to scan bar codes into File Maker. This was a new system, different from those being used at other locations such as the successful warehouse shown to the Potters at Discovery Day, and the Potters were used as guinea pigs for the new system, which had many operating deficiencies. The Potters were thus forced to waste time and resources creating Excel spreadsheets to manually keep track of shelving

14

inventory, when Franchisor's system was supposed to automatically allow them to track shelving inventory through scanning of bar codes.  This unnecessary time and effort made it impossible for the Potters to dedicate as much time as they wanted to obtain new customers.

☐  The Potters were forced to serve as their own IT department, constantly troubleshooting computer, email, and CRM issues that Franchisor's employees failed to address, further taking time away from the Potters' sales and marketing efforts.

☐  Despite Franchisor's representations about limited competition and short sales cycles, the Potters experienced significant competition from both shredding companies and established file management companies, and the sales cycle was quite long, usually months. The Potters quickly learned that businesses generally do not have a sense of urgency to look into file storage, and do not see it as a priority.

41.  File Depot was not, as it had represented to the Potters, prepared to support its franchisees in any way and in fact did not have a valuable system to provide to its franchisees.

42.  Despite many emails from the Potters alerting Franchisor to the many issues described above, the Potters repeatedly received little to no assistance from Franchisor in response to those complaints.

43.  In particular, Mari Potter laid out a number of the issues stated above in an email to Franchisor on January 21, 2016.  Despite representations from Franchisor that these issues would be addressed, after three weeks, critical issues, such as those with File Maker and the franchisee-website, were yet to be

addressed.   Mari Potter again emailed File Depot asking for assistance with these issues.

44.    After a number of complaints from the Potters about these and other issues, Perry flew to visit the Potters in Savannah, GA from February 1-3, 2016 to "smooth things over."  During this visit, Perry took the Potters and their general manager to dinner, calling it an apology dinner for "dropping the ball."

45.    On March 16, 2016, Perry emailed all franchisees asking them to manually fill out Excel spreadsheets with the names of their customers and sales made in their businesses, due to the fact that File Depot's CRM software was not capable of tracking sales.

46.    By April 2016, the Potters' business was suffering such that it was becoming impossible for them to remain open.   Nevertheless, the Potters remained willing to try to make the business work, and participated in a phone call with Perry on or around April 10, 2016 about ways to increase sales and decrease expenses for their business.

47.    After this phone call, Mari Potter sent requested stats about the Potters' expenses and sales to Perry so that he could provide advice on these items.   However, she received no response from Perry or anyone else associated with File Depot, and was required to transmit a follow up email four days later asking again for assistance.   Although she eventually received a response, File Depot did not offer any immediate solutions, and its response did not address all of the Potters' complaints.

48.     On April 22, 2016, Mari Potter emailed Madison, informing him that although she planned to do a 30-day push in order to try to revitalize the business and get enough sales to keep the business operating, it was possible that they would have to sell or close the business due to its poor performance.

49.     This push was insufficient to save the Potters' business, and they were forced to close on July 31, 2016.

50.     File Depot presented itself to the Potters as a tested, comprehensive system when, in fact, many of the services and features of the system that it pitched to the Potters were nonexistent, or at best in development stages at the time that these representations were made.

51.     Furthermore, the financial performance projections provided to the Potters were both inaccurate and provided without required disclosures. Specifically, these projections were provided to the Potters without also providing associated disclosures as required of franchisors by the FTC, including information about how many franchisees actually achieve the stated results and the differences between units that achieved these results and the unit that the Potters would be operating.  16 C.F.R. § 436.5(s).

52.     The Potters reasonably relied on the misrepresentations set forth above, and as a result have suffered damages of no less than $230,000.

**Rush**

53.    Rush first became interested in becoming a File Depot franchisee on or around September 2, 2015, while working with a franchise consultant, FranChoice, which introduced him to the concept.

54.    In a call on September 4, 2015 with Miller, a sales consultant for File Depot from SGG, Miller reviewed with Rush a PowerPoint presentation called "The File Depot Intro."  This presentation stated, in part, that: growth was "inevitable" for franchisees; a franchised location had not made a sales call in over three years (as evidence of a high retention rate); a franchisee would merely need to follow up on SEO-generated leads from File Depot's website; the system had low overhead and quick ramp up; and the franchise was easy to manage and could be successfully run by an absentee owner.

55.    Rush took notes during this call, which also reflect the following additional representations that Miller made on that call:

- File Depot franchisees have a 45.6% profit margin;

- The total investment in the franchise would be $115,000 to $145,000, reflecting a smaller financial commitment than many other franchise opportunities, and a profitable business with high profit margin;

- File Depot franchises enjoyed a 98% customer retention rate; and

- It took File Depot franchises 90 days to 6 months to break even.

56.    Additionally, File Depot presented him with a "Marketing & Operations" presentation, which boasted limited competition, a short sales cycle, Franchisor corporate launch support, virtual training, and email templates and sending capabilities.

57.    Shortly thereafter, on September 10, 2015, Rush received File Depot's FDD from Brown from SGG.

58.    Throughout September of 2015, Rush participated in several calls with File Depot employees and franchisees.  On one such call, on September 15, 2015, Crowe represented that it took him only 3.5 months to break even in his File Depot business, insinuating that Rush could expect the same results.  Crowe also stated on this call that, even as a young business, File Depot ranked fourth nationally when compared to competitors in similar businesses, and that it would soon be moving into the third-place ranking.  Crowe used this as a selling point to try to entice Rush to sign up quickly, before his preferred territory could be taken by another prospective franchisee.  Crowe also stated on this call that File Depot would support Rush's ramp up with a six-month marketing effort to ensure he got off to a strong start, and emphasized that File Depot had a 'turn-key solution' for providing support to its franchisees.

59.    Rush was then invited to travel to New Orleans for Discovery Day, for which File Depot had offered to pay $500 toward his flight and lodging. During Discovery Day, Rush received a "Meet the Team Day" packet.  This packet and the Marketing and Operations presentation included many

representations that in fact were untrue, as well as a number of material omissions, including the following:

☐ File Depot provides a "comprehensive startup, training and support package".  However as discussed more fully below, the startup package was incomplete and untested, and the training and support were incomplete and/or nonexistent.

☐ The presentation listed medical businesses and hospitals as target customers.  Rush later discovered that nearly all of these types of clients' records are already digital or required to be digital soon, and File Depot's digital offering was not sufficient to service hospitals' needs or requirements.

☐ File Depot would set up the "most comprehensive training program in the industry, from sales and marketing to operations set-up".  However, after the first week of training, which consisted of mostly sales training, Rush was left to figure the rest out on its own. There was no operational training and other than some outdated marketing flyers, no marketing training or support was provided.

☐ File Depot would "[a]ssist in grand opening support in prospecting, lead development, proposals, sales cycle & sales closings".  In reality, Rush received no assistance on these items.

☐ File Depot would "[b]egin prospect development & marketing awareness within the first 90 days".  While File Depot did set up a call center, this service elicited many complaints from prospective clients and was ineffective in prospect development.  Otherwise, the Franchisor provided no assistance with this item.

☐ File Depot would "[t]each ongoing best practices, quarterly seminars, secure website management, . . . ongoing database management, operations, accounting, pricing and prospect management training, .

. . Develop lead generation, . . . [and] teach national and regional account strategies." Other than purchasing a client list for Rush's territory and hiring the call center mentioned above, no services on this list were provided by File Depot.

☐ The Franchisor presented Rush with metrics on how File Depot businesses make money. However, Rush later learned that the metrics used in this slide were incorrect. For example:

Rush's warehouse is 3,000 square feet with 18' ceilings. When Slide 19's metrics are applied, they show that Rush can store 24,923 boxes and generate $9,719.97/month in revenue. Adding the calculation recommendation at the bottom of the page, increases revenue to $14,579.95/month.

This representation was untrue because Rush can only fit 11,000 boxes into his 3,000 sq. ft. warehouse—less than half the projected 24,923. Thus, the revenue potential that had been represented to him was drastically overstated. File Depot's model simply does not work. In addition, Franchisor pushed Rush to add a shredding system, which took away even more room in his warehouse that could have been used for box storage.

☐ Despite the representations that File Depot would provide a number of operational support services on, it was in fact not able to provide a security expert, recycling partner, shredding partner, realtor, or racking expert. File Depot also failed to provide hands-on software training, hands-on warehouse training, or assistance with equipment selection and purchase with its operations group.

☐ Despite representations that it would provide comprehensive marketing support, File Depot had no marketing group and provided no initial campaign development assistance. Due to the lack of a marketing group, there was also never any initial email blast development or sending, initial print campaign

development or sending, or 90-day marketing plan strategy discussions.

☐ Despite representations about the capabilities of its CRM system (which File Depot represented had been implemented in October 2015), in reality, mobile access capability was not available until January 31, 2016, and there were issues limiting usage efficiency. Digital signatures were not available, so that every work order had to be printed and signed manually, and there was no online requesting capability.

☐ The Marketing & Operations presentation promised an "Online Portal Loaded with Curriculum" that did not exist, with the result that there was no "Ramp-Up Process" or "Access within 48 Hours."

☐ There was no "Lifetime Support," "Annual Conventions," or "Sharing Ideas for Getting More Customers.

☐ There was no "Success Assurance Plan," nor were there email templates, proposal capabilities or e-marketing templates.

60.  File Depot presented itself to Rush as a tested, comprehensive system when, in fact, many of the services and features of the system that it pitched to Rush were nonexistent, or at best in development stages at the time that these representations were made.

61.  Furthermore, the financial performance projections provided to Rush were both inaccurate and provided without required disclosures. These projections were provided to Rush without also providing associated disclosures as required of franchisors by the FTC, including information about how many franchisees actually achieve the stated results and the differences between units

that achieved these results and the unit that Rush would be operating.  16 C.F.R.
§ 436.5(s).

62.    Also during Discovery Day, Crowe took the prospective franchisees
in attendance, including Rush, on a tour of a File Depot warehouse in Slidell,
Louisiana, which was described as a "fully operational business," with shelving
units that were entirely full of boxes, and a shredding machine.   At no point
during this tour was it disclosed that the owner was not using File Depot's system
that was being offered to new franchisees, as this owner had been a former
licensee operating for many years under a different model.  This licensee, in fact,
could not have been operating under the system that was pitched to the
prospective franchisees because, as described above, that system was
incomplete and at best still in the development stages.

63.    Relying on File Depot's representations and the information
presented at Discovery Day, Rush signed a franchise agreement with File Depot
on October 15, 2015, and paid a franchise fee of $49,500 (the "Rush Franchise
Agreement") (collectively, the Potter Franchise Agreement and the Rush
Franchise Agreement are referred to herein as the "Franchise Agreements").
The Rush Franchise Agreement included, among others, the following
provisions:

> □    "TFD and its affiliate/principals, as a result of the
> expenditure of time, skill, effort, and money, have
> developed and own a unique system (the "System")
> related to the establishment, development, opening, and
> operation of a business . . .."

☐ "TFD's System is comprised of various proprietary and, in some cases, distinguishing elements . . .."

☐ TFD's manuals "contain significant proprietary and confidential information which makes the System unique as a whole . . .."

☐ "At all times during the term of this Agreement, Franchisee must (a) diligently and effectively promote, market and engage in the Franchised Business, (b) develop, to the best of its ability, the potential for the Franchised Business, and (c) devote and focus its attentions and best efforts to such promotion and development."

☐ "Prior to opening, TFD will provide, as TFD deems appropriate in its sole discretion, to Franchisee the following assistance . . . (8) provide Franchisee with the Initial Supplies Kit (as defined in Section 3.02(c)), as well as provide the products/services associated with the Initial Launch Marketing Kit . . .."

☐ "Upon reasonable notice, TFD may require attendance of designated personnel of Franchisee (and Franchisee and such designated personnel shall attend) at additional training courses, seminars, conferences, webinars, or other programs that are deemed by TFD to be relevant or appropriate to the successful operation of the System."

☐ "TFD will be reasonably available to the Primary Contact Owner or General Manager during normal business hours at its headquarters for consultation and guidance with respect to the operation and management of the Franchised Business."

☐ "Franchisee will, during the term of this Agreement, operate the Franchised Business, in accordance with this Agreement and the System as set forth in the Manuals, on a full-time and continuous basis, except as caused by events of Force Majeure."

☐   "Franchisee must use the computerized record keeping and accounting systems that TFD may establish or designate."

☐   "Franchisee must use an e-mail address TFD designates or approves for communication with TFD."

☐   "Franchisee must use in the Franchised Business at all times the proprietary CRM, which TFD (or TFD's designated supplier) has developed and/or selected for the System."

64.     After attending training in New Orleans, LA from October 18-23, 2015, Rush's lease on his warehouse space began on November 1, 2015, after which he began to outfit and furnish his space to begin operations.  However, as he began this process, it became clear that he needed to source his own real estate space, pallet racking, shredding equipment, forklift, delivery van, and other operational items, due to the lack of assistance from Franchisor's recommended vendors.

65.     File Depot provided little to no guidance for what width of shelving to buy, and Rush was forced to determine how to outfit and operate his location on his own or by calling other franchisees, as the minimal resources provided by File Depot did not amount to anything close to a "system" that he could follow in order to commence operations.

66.     After purchasing the franchise, Rush encountered a number of other issues that were inconsistent with Franchisor's representations, including but not limited to:

☐     Franchisor's email system was not operational, such that all emails sent by Rush to prospective clients were either rejected by the email servers of the intended recipients or sent directly to the recipients' spam boxes. Rush informed Franchisor of this issue on multiple occasions, and was eventually forced to purchase his own domain name to have an email address that worked properly.

☐     The callers from the call center hired by Franchisor were not understandable and were making unintelligible calls to prospective clients, resulting in complaints from clients that received the calls.

☐     There was significant delay in the formation of Rush's franchisee-website after multiple requests for assistance. After no progress from File Depot for over two months, Rush tried sending his website information to File Depot's vendor himself for a month. Then, after asking File Depot for assistance again, Rush found out that it was not using that vendor anymore and instead Crowe was attempting to handle this himself.

☐     In February of 2016, Rush requested information from File Depot to help sell its shredding services to clients. In response, instead of providing File Depot brand marketing materials or steps for promoting this service, Crowe sent a PowerPoint presentation to Rush from File Depot's competitor, Cintas, for Rush to use in marketing File Depot products.

☐     In late February of 2016, Rush discovered that the 21 spreadsheets of prospective leads that File Depot had purchased for him could not be inputted into File Depot's software. Instead, Crowe advised Rush to hire someone to re-input all this information by hand, which was prohibitively costly.

67.    Franchisor was not, as it had represented to Rush, prepared to support its franchisees in any way and in fact did not have a unique, proprietary, or valuable system.

68.    Despite many emails from Rush alerting Franchisor to these issues, he received little to no assistance.

69.    By the spring of 2016, Rush's business was suffering such that it was becoming impossible for him to remain open.  Nevertheless, Rush remained willing to try to make the business work, and participated in phone calls on April 5, 2016 with File Depot about ways to increase sales and decrease expenses for his business.

70.    To his dismay, on a June 28, 2016 call, Crowe and Perry told Rush to abandon his warehouse space and put his clients' boxes in a commercial self-storage space, a barn or garage on his personal property, in order to save money.  This, however, was completely contrary to the proprietary system File Depot had sold him, and in violation of Rush's obligations to his clients, HIPAA regulations, and Franchisor's representations about its system.

71.    Despite Scott Rush's best efforts, he was unable to make his File Depot business profitable, and as a result was unable to continue operating.

72.    Scott Rush was forced to close his File Depot business on July 29, 2016.

73.    As a result of Franchisor's misrepresentations and omissions, Rush suffered losses amounting to at least $233,410.

## <u>COUNT ONE</u>
### (Violation of the New York Franchise Sales Act (the "New York Act") – The Potters Against File Depot, Crowe, Perry, and SGG)

74.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

75.     Under the New York Act, N.Y. Gen. Bus. L. 680 et seq., it is unlawful for any person to "make any untrue statement of a material fact in any application, notice, statement, prospectus or report filed with the department under this article, or willfully to omit to state in any such application, notice, statement, prospectus or report any material fact which is required to be stated therein, or to fail to notify the department of any material change as required by this article."

76.     Furthermore, it is unlawful for a person, "in connection with the offer, sale or purchase of any franchise, to directly or indirectly:

      a.     Employ any device, scheme, or artifice to defraud.

      b.     Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. It is an affirmative defense to one accused of omitting to state such a material fact that said omission was not an intentional act.

      c.     Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

N.Y. Gen. Bus. Law § 687.

77.    File Depot and Perry violated the New York Act by providing unlawful financial performance representations prior to the Potters' purchase of their franchise that dramatically overstated the potential sales of the business, as described in more detail above.

78.    Furthermore, File Depot, SGG, Crowe and Perry each violated the New York Act by making false representations to the Potters for the purpose of inducing them to enter into the Potter Franchise Agreement.    These representations include, but are not limited to:

      a.    that File Depot had a unique, distinguished, and proven system;

      b.    that it had systems in place for and the ability to support new franchisees; and

      c.    that the warehouse in Louisiana that the Potters were shown at Discovery Day and training was an example of a franchisee operating under Franchisor's proven system.

79.    The New York Act also provides for joint and several liability for any person who "directly or indirectly controls a person liable under this article, a partner in a firm so liable, a principal executive officer or director of a corporation so liable, a person occupying a similar status or performing similar functions, and an employee of a person so liable" who materially aids in an act or transaction constituting a violation of the act.  N.Y. Gen. Bus. Law § 691(3).  As such, both Crowe and Perry are also liable for all violations of File Depot under the New York Act.

80.     The Potters reasonably relied on the misrepresentations set forth above, and as a result have suffered damages of no less than $230,000.

## COUNT TWO
### (Fraud – The Potters Against File Depot, SGG, Perry, and Crowe)

81.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

82.     Defendants committed fraud by knowingly making false representations to the Potters for the purpose of inducing them to enter into the Potter Franchise Agreement.

83.     These representations include, but are not limited to:

    a.      that Franchisor had a unique, distinguished, and proven system;

    b.      that it had systems in place for and the ability to support new franchisees; and

    c.      that the warehouse in Louisiana that the Potters were shown at Discovery Day and training was an example of a franchisee operating under Franchisor's proven system.

84.     These representations proved to be untrue, the Potters reasonably relied on this information in deciding to enter into the Potter Franchise Agreement, and as a result have suffered damages of no less than $230,000.

## COUNT THREE
### (Fraud by Omission – The Potters Against File Depot, SGG, Perry, and Crowe)

85.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

86.     Perry and File Depot committed fraud by omission by providing financial projections to the Potters without also providing associated disclosures as required of franchisors by the FTC, including information about how many franchisees actually achieve the stated results and the differences between units that achieved these results and the unit that the Potters would be operating.  16 C.F.R. § 436.5(s).

87.     Furthermore, File Depot and Crowe failed to disclose to the Potters that the warehouse in Louisiana that they were shown at Discovery Day and training was not, in fact, operating under Franchisor's "proven" system under which the Potters would operate.  File Depot and Crowe had a duty to disclose this information because they held out the warehouse on Discovery Day as representative of the File Depot system.

88.     File Depot, SGG, Perry, and Crowe committed fraud by omission by representing to the Potters that File Depot had a proven, proprietary, and unique system for its franchisees, but failing to disclose that this system was untested, still in the planning stages, and in some aspects would not be ready for the Potters' use when they opened their business.

89.     Defendants failed to disclose this information to the Potters, knowing that they had no way to know the truth behind the omissions, as Franchisor had superior access to the omitted information.

90.     File Depot omitted these facts in order to induce the Potters to enter into the Potter Franchise Agreement.

31

91.    The Potters relied on the information provided as accurate and complete, and have suffered damages as a result of Franchisor's omission, in an amount not less than $230,000.

## COUNT FOUR
### (Breach of Contract – The Potters Against File Depot)

92.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

93.    Pursuant to the Potter Franchise Agreement, File Depot had obligations to provide an initial supplies kit, initial launch marketing kit, and related services, to provide additional training, and to be reasonably available to the Potters during business hours to answer questions.

94.    Despite these obligations, Franchisor failed to provide an effective CRM system, call center, or marketing materials that were not extremely outdated, failed to follow through with training calls that it had scheduled with the Potters on multiple occasions, and failed to make itself remotely "reasonably" available to them for questions during business hours.  In fact, on multiple occasions, the Potters waited 4 or 5 days for a response to emailed requests for assistance on critical aspects of business operations.  These failures amount to breaches of the Potter Franchise Agreement.

95.    Furthermore, Franchisor made it impossible for the Potters to fulfill their obligations of various provisions of the Potter Franchise Agreement.  By failing to provide accounting, email, CRM, and other systems that were

operational and in accordance with its own manuals, the Franchisor made it impossible for the Potters to perform under the Potter Franchise Agreement, and also forced them to spend time and focus on fixing these systematic problems rather than marketing and promoting their business.   Through these failures, Franchisor constructively terminated the Potter Franchise Agreement.

96.    As a result of these breaches, the Potters has suffered damages of no less than $230,000.

## COUNT FIVE
### (Violation of the Indiana Franchise Act (the "Indiana Act") – Rush Against File Depot, Crowe, and SGG)

97.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

98.    Under the Indiana Act, it is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly:

> (a)    To employ any device, scheme, or artifice to defraud;

> (b)    To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

> (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

Ind. Code § 23-2-2.5-27.

99.    File Depot and Crowe violated the Indiana Act by providing unlawful financial performance representations prior to Rush's purchase of its franchise that dramatically overstated the potential sales of the business, as described in more detail above.   Rush reasonably relied on this information, and as a result has suffered damages.

100.    File Depot, SGG, and Crowe also violated the Indiana Act by making false representations to Rush for the purpose of inducing him to enter into the Rush Franchise Agreement.   These representations include, but are not limited to:

      ☐    that success under File Depot's system was "inevitable";

      ☐    that Franchisor had a unique, distinguished, and proven system;

      ☐    that it had systems in place for and the ability to support new franchisees; and

      ☐    that the warehouse in Louisiana that Rush was shown at Discovery Day and training was an example of a franchisee operating under Franchisor's proven system.

101.    The Indiana Act further provides for joint and several liability for any person who materially aids and abets a violation.   Ind. Code § 23-2-2.5-29.   As such, Crowe and SGG are also liable with File Depot for all violations of the Indiana Act.

102.    A person injured by a violation of the Act may recover consequential damages, attorneys' fees and interest.   Ind. Code § 23-2-2.5-28.

103.   Rush reasonably relied on the representations made by File Depot, SGG, and Crowe, and as a result has suffered damages of no less than $233,410.

## COUNT SIX
### (Fraud – Rush Against File Depot, SGG, and Crowe)

104.   Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

105.   Franchisor, SGG and Crowe committed fraud by knowingly making false representations to Rush for the purpose of inducing him to enter into the Rush Franchise Agreement.

106.   These representations include, but are not limited to:

☐   that success under File Depot's system was "inevitable";

☐   that Franchisor had a unique, distinguished, and proven system;

☐   that it had systems in place for and the ability to support new franchisees; and

☐   that the warehouse in Louisiana that Rush was shown at Discovery Day and training was an example of a franchisee operating under Franchisor's proven system.

107.   These representations proved to be untrue, Rush reasonably relied on this information in deciding to enter into the Rush Franchise Agreement, and as a result has suffered damages of no less than $233,410.

**COUNT SEVEN**
**(Fraud by Omission – Rush Against File Depot, Crowe, and SGG)**

108.  Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

109.  File Depot and Crowe committed fraud by omission by providing financial projections to Rush without also providing associated disclosures as required of franchisors by the FTC, including information about how many franchisees actually achieve the stated results and the differences between units that achieved these results and the unit that Rush would be operating.  16 C.F.R. § 436.5(s).

110.  Furthermore, File Depot and Crowe failed to disclose to Rush that the warehouse in Louisiana that Rush was shown on Discovery Day and training was not, in fact, operating under Franchisor's "proven" system under which Rush would operate.

111.  File Depot, SGG, and Crowe also committed fraud by omission by representing to Rush that File Depot had a proven, proprietary, and unique system for its franchisees, but failing to disclose that this system was untested, still in the planning stages, and in some aspects would not be ready for Rush's use when he opened his business.

112.  File Depot, SGG, and Crowe failed to disclose this information to Rush, knowing that he had no way to know the truth behind the omissions, as Franchisor had superior access to the omitted information.

113.   File Depot SGG, and Crowe omitted these facts in order to induce Rush to enter into the Rush Franchise Agreement with File Depot.

114.   Rush relied on the information provided as accurate and complete, and has suffered damages as a result of Franchisor's omission, in an amount not less than $233,410.

## COUNT EIGHT
### (Breach of Contract – Rush Against File Depot)

115.   Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

116.   Pursuant to the Rush Franchise Agreement, File Depot had obligations to provide an initial supplies kit, initial launch marketing kit, and related services, to provide additional training, and to be reasonably available to Rush during business hours to answer questions.

117.   Despite these obligations, Franchisor failed to provide an effective CRM system, call center, or marketing materials that were not extremely outdated, and failed to provide useful or meaningful responses to Rush's questions and requests for support.   These all constitute breaches of the Rush Franchise Agreement.

118.   Furthermore, Franchisor made it impossible for Rush to fulfill its obligations of various provisions of the Rush Franchise Agreement.   By failing to provide accounting, email, CRM, and other systems that were operational and in accordance with its own manuals, Franchisor made it impossible for Rush to

perform under the Rush Franchise Agreement, and also forced Rush to spend time and focus on fixing these systematic problems rather than marketing and promoting its business.    Through these failures, Franchisor constructively terminated the Rush Franchise Agreement.

119.  As a result of these breaches, Rush has suffered damages of no less than $233,410.

## COUNT NINE
**(Violation of Louisiana Unfair Trade Practices and Consumer Protection Law (the "Louisiana Law") – The Potters and Rush Against File Depot, Crowe, Perry, and SGG)**

120.  Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

121.  Defendants have engaged in unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce, within the meaning of the Louisiana Law, by providing unlawful financial performance representations prior to Plaintiffs' purchases of their franchises that dramatically overstated the potential sales of the businesses, as described in more detail above.    Plaintiffs reasonably relied on this information, and as a result have suffered damages.

122.  Furthermore, Defendants violated the Louisiana Law by making false representations to Plaintiffs for the purpose of inducing them to enter into the Franchise Agreements.  These representations include, but are not limited to:

☐    that success under File Depot's system was "inevitable";

☐   that Franchisor had a unique, distinguished, and proven system;

☐   that it had systems in place for and the ability to support new franchisees; and

☐   that the warehouse in Louisiana that Plaintiffs were shown at Discovery Day and training was an example of a franchisee operating under Franchisor's proven system.

123.   Plaintiffs have suffered an ascertainable loss of money or property as a result of the use or employment by Defendants of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405.

124.   Plaintiffs are entitled to recover damages, attorney's fees, and costs.

## Demand for Jury Trial

125.   Plaintiffs hereby demand a trial by jury.

## Prayer for Relief

WHEREFORE, Plaintiffs seek judgment as follows:

A.   An award of actual damages in an amount to be determined at trial, but in no event less than $509,290;

B.   An award of attorneys' fees to the extent permitted by law;

C.   An award of costs and disbursements; and

D.   Such other and further relief as the Court deems just and proper.

Date: June 6, 2017               Respectfully submitted by,

                                 TIM AND MARI POTTER, TMP VENTURES,
                                 LLC, SCOTT RUSH, AND S & D RUSH CORP.

                                 BY:   */s/ W. Scott Keaty*_____
                                         W. Scott Keaty (#23151)
                                         Kantrow Spaht Weaver and Blitzer (APLC)
                                         445 North Boulevard, Suite 300
                                         Baton Rouge, Louisiana  70802
                                         Tel.: (225) 383-4703
                                         Fax: (225) 343-0630
                                         Email: scott@kswb.com

                                         W. Michael Garner
                                         Erin E. Conway
                                         *(pro hac vice applications to be filed)*
                                         Garner & Ginsburg, P.A.
                                         222 South Ninth Street
                                         Suite 2930
                                         Minneapolis, Minnesota  55402
                                         Tel.: (612) 259-4800
                                         Fax: (612) 259-4810
                                         Email: wmgarner@yourfranchiselawyer.com
                                                econway@yourfranchiselawyer.com